Filed 12/17/20  Webcor Construction L.P. v. Lendlease (US) Construction, Inc. CA2/4
NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| WEBCOR CONSTRUCTION L.P., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LENDLEASE (US) CONSTRUCTION, INC., et al., <br><br> Defendants and Appellants. | B299310 <br> (Los Angeles County <br> Super. Ct. No. 19STCV03357) |

APPEAL from orders of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

Alston & Bird, John D. Hanover, J. Andrew Howard, and Joseph S. Sestay for Defendant and Appellant Lendlease (US) Construction, Inc.

Ralls Gruber & Niece and John Foust; Ken W. Choi and Daniel A. Cantor for Defendant and Appellant Oceanwide Plaza LLC.

Gordon Rees Scully Mansukhani, Sandy Kaplan, Matthew Peng, and Don Willenburg; Rutan & Tucker, William T. Eliopoulos, Heather N. Herd, and Carrie MacIntosh for Plaintiff and Respondent Webcor Construction L.P.

---

## INTRODUCTION

Appellant Oceanwide Plaza LLC (Oceanwide) hired appellant Lendlease (US) Construction, Inc. (Lendlease) to serve as the general contractor on Oceanwide's development project. Although the parties had not yet executed a prime contract, Oceanwide gave Lendlease the go-ahead to begin work on the project. At the time, the parties had negotiated a draft agreement (Negotiated Draft), which included an arbitration provision. Lendlease then hired respondent Webcor Construction L.P. (Webcor) as a subcontractor, and the two executed a subcontract that purported to incorporate the prime contract's arbitration agreement in disputes between Webcor and Lendlease that involved Oceanwide's "correlative rights and duties." Lendlease and Oceanwide later executed a prime contract, which included the same arbitration provision contained in the Negotiated Draft.

2

The project apparently did not go as planned, and Webcor filed this action against Lendlease, Oceanwide, and others, asserting various causes of action.[1]  Lendlease and Oceanwide separately moved to compel arbitration under the subcontract, claiming it incorporated the prime contract's arbitration provision.  Oceanwide contended it was entitled to enforce the subcontract as a third-party beneficiary.  Webcor opposed appellants' motions.  It argued the subcontract incorporated no arbitration provision because the prime contract had not been executed when the subcontract was signed and because, according to Webcor, the subcontract did not reference the Negotiated Draft.  Webcor also maintained that Oceanwide had no standing to enforce any arbitration agreement in the subcontract.  The trial court denied the motions.  The court did not decide whether the subcontract included a valid arbitration agreement, but instead concluded that most of Webcor's claims did not involve Oceanwide's correlative rights and duties.  As to the one claim that the court found did involve Oceanwide's correlative rights and duties, the court refused to compel arbitration because of the risk of conflicting rulings in different forums.

On appeal, Lendlease and Oceanwide contend: (1) the subcontract incorporated an arbitration agreement; (2) Oceanwide was entitled to enforce the arbitration agreement

---

[1]     The other defendants are not pertinent to the resolution of this appeal.

3

as a third-party beneficiary; (3) under the arbitration agreement, whether Webcor's claims involved Oceanwide's correlative rights and duties was a question for the arbitrator; and (4) alternatively, Webcor's claims did involve Oceanwide's correlative rights and duties.

While we agree that the subcontract incorporated an arbitration agreement, we conclude that this agreement was not intended to benefit Oceanwide, and therefore that Oceanwide had no standing to enforce it. As to Webcor's claims against Lendlease, the trial court had discretion to refuse to compel arbitration to avoid the risk of conflicting rulings. Accordingly, we affirm.

## BACKGROUND

A. *The Project, the Limited Notice to Proceed, and the Negotiated Draft*

Oceanwide, the owner and developer of a large, mixed-use development project in downtown Los Angeles, hired Lendlease to serve as the project's general contractor. Lendlease, in turn, hired Webcor as a concrete subcontractor to perform all installations of reinforced concrete in the project.

In February 2015, before the execution of a prime contract between the parties, Oceanwide and Lendlease agreed that Lendlease would begin construction, and Oceanwide issued a "Limited Notice to Proceed," authorizing Lendlease to proceed with work while the terms of the prime contract were being finalized. At the time, Oceanwide and

4

Lendlease had created and tentatively agreed to the Negotiated Draft.[2]

The Negotiated Draft included an arbitration provision: "[A]ny claim, dispute or other matter in question arising out of or related to the Contract Documents . . . shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of this agreement." The relevant rules of the American Arbitration Association (AAA) provided, among other things, that the arbitrator shall have the power to rule on the scope of the arbitration agreement. (Rule R-9, Construction Industry Arbitration Rules and Rules and Mediation Procedures, AAA (Amended July 1, 2015) (AAA Rules).)

B. *The Subcontract and the Executed Prime Contract*

Lendlease and Webcor began negotiating the terms of a subcontract in mid-2015. During those negotiations, Webcor requested that Lendlease provide a copy of the prime contract, which at that time had not yet been executed. In early 2016, Lendlease suggested that Webcor review the Negotiated Draft in Lendlease's office, but at Webcor's

---

[2]     In declarations filed in the trial court, Oceanwide's and Lendlease's representatives described this draft as "99%-negotiated" or as a "near-final draft."

5

insistence, it later agreed to send Webcor a copy of the document.

On February 25, 2016, Lendlease and Webcor executed the subcontract. As relevant here, Article 1 of the subcontract provided: "Subject only to the terms of Article 27 [the dispute-resolution provision], nothing herein shall be construed to be a binding agreement to arbitrate any dispute arising hereunder, notwithstanding any provision to the contrary in the Contract Documents." In turn, the first paragraph of Article 27 stated: "In the event of any dispute between [Webcor] and [Lendlease] arising out of or relating to this Subcontract, or the breach thereof, which involves the correlative rights and duties of [Oceanwide], the dispute shall be decided in accordance with the Contract Documents, and [Webcor], its suppliers, subcontractors and its guarantors, surety, or sureties, shall be bound to [Lendlease] to the same extent that [Lendlease] is bound to [Oceanwide] by the terms of the Contract Documents . . . ." As to disputes between Webcor and Lendlease that did not involve Oceanwide's correlative rights and duties, the second paragraph of Article 27 provided that either party could seek redress in court.

Under Schedule 1 of the subcontract, the "Contract Documents" included "[t]his [s]ubcontract" and "[t]he Contract," among other documents. According to the subcontract's cover page, the term "Contract" referred to the prime contract. Acknowledging that Lendlease and Oceanwide had not yet executed a prime contract, Paragraph III.24 of Exhibit B of the subcontract provided: "[Lendlease]

6

agrees that all references in this Subcontract to the Contract Documents shall mean and refer to the current draft terms of the Prime Contract between [Lendlease] and [Oceanwide] (the 'Negotiated Draft') until such time as [Lendlease] and [Oceanwide] execute the Prime Contract, and [Webcor] shall be bound by all terms and conditions of the Negotiated Draft."  The same paragraph also purported to bind Webcor to the terms of the future prime contract, even if they differed from those of the Negotiated Draft.[3]  Lendlease and Webcor later added a rider to the subcontract, providing that Oceanwide was "an express third party beneficiary of this Subcontract."

Oceanwide and Lendlease executed the prime contract on July 15, 2016, about four and a half months after the Webcor subcontract was executed.  The executed prime contract included the same arbitration provision contained in the Negotiated Draft.  Acknowledging the execution of the prime contract, Lendlease and Webcor later executed Change Order No. 7, which removed all of the subcontract's references to the Limited Notice to Proceed and deleted Paragraph III.24 from Exhibit B.

---

[3]     An earlier draft of the subcontract included a duplicate paragraph at Paragraph 136 of Exhibit B.1 of the agreement, but the parties deleted it after Webcor objected to being bound to future terms that had not yet been determined.  According to the deposition testimony of Webcor's lead negotiator, John Harrington, he had not noticed the identical provision at Paragraph III.24 of Exhibit B, which made it into the executed subcontract.

## C. *Webcor's Complaint and Appellants' Motions to Compel Arbitration*

In December 2018, following delays in the project and disagreements among the parties, Webcor recorded a mechanic's lien on the project, and in January 2019, filed this action against Lendlease, Oceanwide, and others. In its operative complaint, Webcor asserted claims for: (1) breach of contract (against Lendlease); (2) foreclosure of mechanic's lien (against Lendlease, Oceanwide, and others); (3) violation of prompt-payment duties (against Lendlease); (4) quantum meruit (against Lendlease and Oceanwide); and (5) declaratory relief (against Oceanwide and others).

Oceanwide and Lendlease responded with separate motions to compel arbitration and stay the proceedings under Code of Civil Procedure sections 1281.2 and 1281.4, relying on the subcontract's dispute-resolution provision. They argued this provision incorporated the arbitration provision of either the prime contract or the Negotiated Draft. Oceanwide, which was not a signatory to the subcontract, contended it was entitled to enforce the subcontract's dispute-resolution provision as a third-party beneficiary.

Webcor opposed both motions. It argued the subcontract could not have incorporated the prime contract's arbitration provision because that agreement had not yet been executed when the subcontract was executed. As to the Negotiated Draft, Webcor asserted the subcontract made no mention of that document and thus could not have

8

incorporated its arbitration provision. In the alternative, Webcor claimed that Oceanwide was not a third-party beneficiary of the subcontract's dispute-resolution provision and thus had no standing to enforce any arbitration agreement it contained. It contended that granting only Lendlease's motion to compel arbitration carried a risk of conflicting rulings in different forums.

D. *The Trial Court's Rulings*

In July 2019, following a hearing on appellants' motions to compel arbitration, the trial court denied both motions in separate orders. The court did not decide whether the subcontract contained a valid arbitration agreement or whether Oceanwide had standing to invoke any such agreement. Rather, it ruled that even assuming the subcontract contained an enforceable arbitration agreement, all but one of Webcor's claims were outside its scope because they did not involve Oceanwide's correlative rights and duties. As to the one claim that according to the court did involve Oceanwide's correlative rights and duties (quantum meruit), the court exercised its discretion under Code of Civil Procedure section 1281.2, subdivision (c) (Section 1281.2(c)), to deny arbitration so as to avoid the risk of conflicting rulings in different forums. Lendlease and Oceanwide timely appealed.

9

## DISCUSSION

We review de novo the trial court's resolution of legal questions underlying its ruling on a motion to compel arbitration. (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60.) The court's denial of arbitration pursuant to Section 1281.2(c), based on the risk of conflicting rulings, is reviewed for abuse of discretion. (*Bunker Hill Park Ltd. v. U.S. Bank National Assn.* (2014) 231 Cal.App.4th 1315, 1324.)

It is undisputed that the substantive rules of the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) govern any arbitration agreement in the subcontract. The policy underlying the FAA ""is to ensure that arbitration agreements will be enforced in accordance with their terms."" (*State Farm General Ins. Co. v. Watts Regulator Co.* (2017) 17 Cal.App.5th 1093, 1098, italics omitted.) "Arbitration is 'a matter of contract' and the policy favoring arbitration does not displace the need for a voluntary agreement to arbitrate. [Citation.] 'Although the FAA preempts any state law that stands as an obstacle to its objective of enforcing arbitration agreements according to their terms, . . . we apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute.'" (*Ibid.*)

Challenging the trial court's denial of their motions to compel arbitration, Lendlease and Oceanwide argue: (1) the subcontract initially incorporated the Negotiated Draft's arbitration provision and later incorporated the executed prime contract's (identical) arbitration provision; (2) while

10

Oceanwide was not a signatory to the subcontract, it was entitled to enforce its dispute-resolution provision as a third-party beneficiary; (3) through the Negotiated Draft's incorporation of the AAA Rules, the parties delegated questions about the scope of the arbitration agreement to the arbitrator, and thus it was not for the trial court to decide whether Webcor's claims involved Oceanwide's "correlative rights and duties"; and (4) alternatively, Webcor's claims did involve Oceanwide's correlative rights and duties.

As we briefly discuss below, we agree that Article 27 of the subcontract, the dispute-resolution provision, incorporated the prime contract's arbitration provision. However, we conclude that Oceanwide had no standing to enforce Article 27, and thus that the trial court acted within its discretion in denying Lendlease's motion to compel arbitration to avoid the risk of conflicting rulings.[4] We therefore do not reach appellants' final contentions.

---

[4] Although the trial court's ruling rested on its analysis of the scope of the arbitration agreement, we are not bound by the court's reasoning. "[I]t is a settled appellate principle that if a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning." (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192-1193.)

A. *The Subcontract Incorporated the Arbitration Provisions of the Negotiated Draft and the Executed Prime Contract*

We agree with Lendlease and Oceanwide that the subcontract contained an arbitration agreement, initially through its reference to the Negotiated Draft's arbitration provision, and later through its reference to the identical provision in the executed prime contract.  Generally, "contract interpretation is an issue of law, which we review de novo . . . ." (*DFS Group, L.P. v. County of San Mateo* (2019) 31 Cal.App.5th 1059, 1079.)  "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citations.]  'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citations.]  'If contractual language is clear and explicit, it governs.'" (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195.)  "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

""'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document.'"" (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54.)  Under Article 27 of the subcontract (the dispute-resolution provision), any dispute between Webcor and Lendlease that relates to that agreement and involves Oceanwide's correlative rights and duties "shall be decided in accordance with the Contract

12

Documents . . . ." Under Schedule 1 of the subcontract, the "Contract Documents" included "[t]he Contract," a term that according to the subcontract's cover page referred to the prime contract. And while, as Webcor points out, Lendlease and Oceanwide had not yet executed the prime contract when the subcontract was executed, the subcontract's Exhibit B, Paragraph III.24, acknowledged this fact and provided that all references to the Contract Documents "shall mean and refer to [the Negotiated Draft]" until Lendlease and Oceanwide execute the prime contract.[5] It is therefore clear that the subcontract's dispute-resolution provision referenced the Negotiated Draft. In turn, the Negotiated Draft included an arbitration provision: "[A]ny claim, dispute or other matter in question arising out of or related to the Contract Documents . . . shall be subject to arbitration . . . ."

After Oceanwide and Lendlease executed the prime contract, Lendlease and Webcor executed Change Order No. 7, deleting Exhibit B, Paragraph III.24, which had

---

[5] Oceanwide suggests the inclusion of this paragraph was potentially a mutual mistake, evidenced by the parties' deletion of the identical Paragraph 136 of Exhibit B.1. Initially, Webcor itself does not make this argument. Moreover, we note that Webcor and Lendlease deleted the latter after Webcor objected to a clause purporting to bind Webcor to the uncertain terms of a future prime contract. Webcor never objected to the incorporation of the Negotiated Draft. Thus, the extrinsic evidence concerning the parties' negotiations is consistent with the language of the subcontract.

substituted references to the Negotiated Draft for the subcontract's references to the prime contract. With this change, the revised subcontract's dispute-resolution provision now incorporated the executed prime contract itself, which included the same arbitration provision contained in the Negotiated Draft. At all times, then, the subcontract incorporated the arbitration provision of either the Negotiated Draft or the executed prime contract.

B. *Oceanwide Had No Standing to Enforce the Subcontract's Dispute-Resolution Provision, and the Trial Court Had Discretion to Deny Lendlease's Motion to Compel Arbitration as Well*

1. *Governing Principles*

"Because arbitration is a matter of contract, generally "'one must be a party to an arbitration agreement to be bound by it or invoke it.'"" (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352,1353 (*DMS Services*).) However, courts have recognized limited exceptions to this rule, allowing nonsignatories to an agreement containing an arbitration provision to compel arbitration of a dispute within the scope of that agreement. (*Ibid.*) Under one of those exceptions, invoked by Oceanwide, a nonsignatory may enforce an arbitration agreement if the nonsignatory is a third-party beneficiary of the agreement. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 242.)

14

"A third party beneficiary may enforce a contract expressly made for his benefit." (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943 (*Murphy*), citing Civ. Code, § 1559.) Status as a third-party beneficiary of a contract, however, does not grant a person the power to enforce any and every provision of the contract; rather, a third-party beneficiary "may enforce those promises directly made for him." (*Murphy, supra,* at 943; accord, *Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 680 (*Sessions*), quoting *Murphy*; *Clark v. California Ins. Guarantee Assn.* (2011) 200 Cal.App.4th 391, 398 ["as a third party beneficiary, the judgment creditor can only enforce those promises made directly for his benefit"], citing *Murphy*, at 943.)

In *Murphy*, a judgment creditor sued the judgment debtor's insurer for breach of the duty to settle, which is included in the implied covenant of good faith and fair dealing. (*Murphy, supra*, 17 Cal.3d at 939-941.) Insurance Code section 11580, subdivision (b)(2), made the judgment creditor a third-party beneficiary of the insurance contract between the defendant and the insurer, and the implied covenant of good faith and fair dealing was a term of the contract for purposes of that statutory provision. (*Murphy*, at 942-943.) Our Supreme Court held, however, that despite her third-party beneficiary status, the judgment creditor had no standing to invoke the insurer's duty to settle because that duty was intended to benefit the insured, rather than a third-party claimant. (*Id.* at 943-944.) The *Murphy* court explained: "A third party should not be permitted to enforce

15

covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. [Citations.] As to any provision made not for his benefit but for the benefit of the contracting parties or for other third parties, he becomes an intermeddler. Permitting a third party to enforce a covenant made solely to benefit others would lead to the anomaly of granting him a bonus after his receiving all intended benefit." (*Id*. at 944.)

Courts have since applied *Murphy*'s teachings beyond the context of insurance policies and the implied covenant of good faith and fair dealing. In *Sessions*, the Court of Appeal applied these principles to reverse an award of attorney fees. (*Sessions*, *supra*, 84 Cal.App.4th at 680-681.) There, a plaintiff sued the defendant, a general contractor, for the breach of a contract between the defendant and a subcontractor. The plaintiff, who provided payroll services to the subcontractor, claimed it was a third-party beneficiary of the contract. (*Id*. at 675-677.) The contract provided that "'[i]n the event it becomes necessary for either party to enforce the provisions of this Agreement,'" the prevailing party would be entitled to attorney fees. (*Id*. at 676, italics omitted.) The trial court sustained a demurrer without leave to amend and awarded the defendant attorney fees based on the reciprocity principles of Civil Code section 1717

16

and the attorney fee provision in the contract.[6]  (*Id.* at 676-677.)

On appeal, the plaintiff argued it would not have been entitled to attorney fees had it prevailed on its claim, and thus that the defendant was likewise not entitled to fees. The Court of Appeal agreed.  (*Sessions, supra,* 84 Cal.App.4th at 680-681.)  Citing *Murphy*'s explanation of the limits of third-party beneficiaries' ability to enforce contractual provisions, the court concluded that even if the plaintiff had prevailed on its third-party beneficiary claim, the attorney fee provision's reference to "either party" excluded the plaintiff, and thus that the signatories had not intended it to benefit the plaintiff.  (*Sessions,* at 680-681, italics omitted.)

Similarly, and as particularly relevant here, in *Fuentes v. TMCSF, Inc.* (2018) 26 Cal.App.5th 541 (*Fuentes*), the court applied *Murphy* to conclude that a plaintiff had no standing to enforce an arbitration provision as a third-party beneficiary.  (*Fuentes, supra,* 26 Cal.App.5th at 551-552.)

---

[6]    "Civil Code section 1717 makes an otherwise unilateral right [to attorney fees] reciprocal when a defendant sued on a contract with a provision awarding attorney fees to the prevailing party defends by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of that contract."  (*Sessions, supra,* 84 Cal.App.4th at 678, italics omitted.)  Because these arguments are inconsistent with a claim for attorney fees under the same contract, a prevailing defendant would not be able to obtain attorney fees without the operation of this statutory provision.  (*Ibid.*)

The plaintiff purchased a motorcycle from a dealership and executed a separate financing agreement with a third-party lender. (*Id.* at 545.) While the purchase agreement contained no arbitration provision (*ibid.*), the financing agreement provided for arbitration of claims between the plaintiff and the lender or any of its "'successors, assigns, parents, subsidiaries, or affiliates and/or any employees, officers, directors, agents, of the aforementioned . . .'" (*id.* at 546). After the plaintiff brought a putative class action against the dealership, the latter sought to compel arbitration under the financing agreement, asserting it was a third-party beneficiary of that contract. (*Id.* at 546-547.)

The *Fuentes* court assumed for the sake of the argument that the dealership was a third-party beneficiary of the financing agreement. (*Fuentes, supra*, 26 Cal.App.5th at 552.) However, based on the relevant language from *Murphy*, the court concluded the dealership could not invoke that agreement's arbitration provision. (*Fuentes, supra*, at 551-552.) It noted that the arbitration clause had "its own list of intended third party beneficiaries," which did not include the dealership. (*Id.* at 552.) The Court of Appeal thus concluded, "the contract affirmatively disproves any intent that the arbitration clause should benefit [the dealership]." (*Ibid.*) Under this authority, the pertinent question is not merely whether Oceanwide was a third-party

18

beneficiary of the subcontract generally, but whether it was an intended beneficiary of Article 27.[7]

As a general matter, it is for the court to decide whether a nonsignatory may invoke an arbitration agreement.[8] (See *Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 469 ["'an arbitrator has no power to determine the rights and obligations of one who is not a party to the arbitration agreement'"]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2020) ¶ 5:287 ["a trial court must first determine the status of a person who demands arbitration under a contract that he or

---

[7] Oceanwide suggests this rule subjects arbitration provisions to "special scrutiny . . . beyond that which is applied to the contract as a whole," and is therefore preempted by the FAA, which "'precludes states from "singling out arbitration provisions for suspect status . . . ."'" (Quoting *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 410.) Not so. The rule that third parties may enforce only those promises intended to benefit them is generally applicable, and as discussed, has been applied in such contexts as attorney fees (see *Sessions*, *supra*, 84 Cal.App.4th at 680-681) and the implied covenant of good faith and fair dealing (see *Murphy*, *supra*, 17 Cal.3d at 943-944), as well as arbitration. Oceanwide offers nothing to show that this rule subjects arbitration provisions to special scrutiny.

[8] Oceanwide does not contend that either the subcontract or the prime contract empowered the arbitrator to decide whether Oceanwide was a third-party beneficiary entitled to compel arbitration. It has therefore forfeited any contention in this regard. (See *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726 [failure to raise contention in opening brief constitutes forfeiture].)

she did not sign"].) This determination involves a question of law that we review de novo. (*DMS Services*, *supra*, 205 Cal.App.4th at 1352.) "The party claiming to be a third party beneficiary bears the burden of proving that the contracting parties actually promised the performance which the third party beneficiary seeks." (*Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 341.)

### 2. *Analysis*

We conclude that Oceanwide was not entitled to invoke Article 27 as a third-party beneficiary. While Oceanwide was undoubtedly a third-party beneficiary of the subcontract under the rider to that agreement, Oceanwide may not enforce Article 27 unless this provision was intended to benefit Oceanwide. (See *Murphy*, *supra*, 17 Cal.3d at 943; *Sessions*, *supra*, 84 Cal.App.4th at 680-681.)

The first paragraph of Article 27 provided: "In the event of any dispute between [Webcor] and [Lendlease] . . . which involves the correlative rights and duties of [Oceanwide], the dispute shall be decided in accordance with the Contract Documents, and [Webcor] . . . shall be bound to [Lendlease] to the same extent that [Lendlease] is bound to [Oceanwide] by the terms of the Contract Documents. . . ." The plain terms of Article 27 limit arbitration to claims between Webcor and Lendlease.[9]

---

[9] We consider the breadth of the arbitration agreement under Article 27 only to the extent it informs our assessment of
(*Fn. is continued on the next page.*)

Only certain disputes "between [Webcor] and [Lendlease]" must be submitted to arbitration under this provision, which made no reference to disputes between Webcor and Oceanwide. Nothing in the nature of an arbitration provision or the subcontract required such restrictive language. Indeed, the Negotiated Draft's arbitration provision stated simply, "[A]ny claim, dispute or other matter in question arising out of or related to the Contract Documents . . . shall be subject to arbitration . . . ." Rather than simply incorporate this provision, Article 27 included the additional limiting language. The subcontract provided in Article 1 that the parties' arbitration obligations would be determined by Article 27 alone, "notwithstanding any provision to the contrary in the Contract Documents," demonstrating a recognition that Article 27's arbitration mandate was narrower. Article 27's reference to disputes between Webcor and Lendlease establishes an intent to limit arbitration under the subcontract to those parties. (See *Sessions*, *supra*, 84 Cal.App.4th at 680-681 [attorney fee provision's reference to "either party" excluded nonsignatory plaintiff, even if plaintiff had been third-party beneficiary (italics omitted)]; *Rath v. Managed Health Network, Inc.* (1992) 123 Idaho 30, 31 [third-party beneficiary not included in provision requiring arbitration of controversies "'between the parties'" (italics omitted)]; 9 Corbin on Contracts (2020)

Oceanwide's standing to enforce it. As noted, we do not decide whether it would have been for the trial court or the arbitrator to determine the agreement's scope as such.

21

§ 46.9 [discussing provision limiting arbitration to "'[a]ny dispute between the Parties'" and stating, "If the term 'party' clearly excludes beneficiaries, such an exclusion must be enforced to honor the overriding policy that the contract terms define and limit the rights of the beneficiary"].)

Oceanwide does not address this limiting language in its briefs, even after Webcor brings it to the forefront in its own brief; rather, Oceanwide simply asserts, repeatedly, that under the first paragraph of Article 27, "any dispute" that involves its correlative rights and duties is subject to arbitration. We, however, may not ignore this language, and instead must give it effect. (See *Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1063 ["'We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage'"].)

Oceanwide emphasizes that the first paragraph of Article 27 referenced Oceanwide twice. Yet the first reference to Oceanwide is an additional *limitation* of the duty to arbitrate. To be subject to arbitration under Article 27, a matter must both (a) be a dispute between Webcor and Lendlease and (b) involve Oceanwide's correlative rights and duties. This limiting language cannot *expand* the signatories' arbitration obligations. Similarly, the second reference to Oceanwide -- providing that Webcor would be "bound to [Lendlease]" to the same extent Lendlease is bound to Oceanwide by the terms of the Contract Document -- does not extend Webcor's duty to arbitrate to claims against Oceanwide. Again, rather than say that Webcor

22

would "be bound to Lendlease and Oceanwide" or simply that it would "be bound by the terms of the Contract Documents," this provision spoke in terms of Webcor's duties to Lendlease alone. The reference to the extent Lendlease is bound to Oceanwide served merely as a measuring stick to determine the scope of Webcor's duties toward Lendlease.

By providing for arbitration of certain disputes between Webcor and Lendlease, Article 27 indicates an intent to benefit Lendlease, but not Oceanwide. As in *Sessions* and *Fuentes*, the exclusion of the third-party beneficiary from the scope of the provision negates an intent to benefit it. (See *Sessions*, *supra*, 84 Cal.App.4th at 680-681 [attorney fee provision that was limited to signatories was not intended to benefit claimed third-party beneficiary]; *Fuentes*, *supra*, 26 Cal.App.5th at 551-552 [arbitration provision that was limited to signatories and certain third parties not including defendant was not intended to benefit defendant].) Oceanwide argues *Fuentes* is distinguishable because unlike Article 27, the arbitration provision there had "'its own list of intended third party beneficiaries,'" which did not include the defendant dealership. (*Fuentes*, at 552.) But just as the provision in *Fuentes* limited its application to the specified parties -- the lender and its "successors, assigns, parents, subsidiaries," etc. (*id.* at 546) -- the first paragraph of Article 27 limited its application to the specified parties, Webcor and Lendlease. Additionally, Oceanwide does not attempt to distinguish *Sessions*, even after Webcor relies on it in its brief.

23

We observe that Article 27's different treatment of disputes between Webcor and Lendlease according to whether they involve Oceanwide's rights and duties made sense for Lendlease. Lendlease and Webcor may not have wanted to arbitrate claims between the two of them. But without the first paragraph of Article 27, Lendlease would have faced a risk of arbitrating disputes with Oceanwide (as it was required to do under the prime contract) while litigating parallel disputes with Webcor in court, leading to duplicative litigation efforts, additional expense, and a risk of conflicting rulings.[10] Oceanwide offers no explanation how a provision requiring arbitration between Webcor and Lendlease alone was intended to benefit Oceanwide. Because Article 27's arbitration provision was not intended to benefit Oceanwide, the latter had no standing to enforce it.[11] (See *Murphy, supra,* 17 Cal.3d at 943-944; *Sessions,*

[10] Under at least some scenarios, Lendlease could implore the trial court to deny arbitration with Oceanwide under Section 1281.2(c). But requiring Webcor to arbitrate relevant claims provided more certainty, as it did not require Lendlease to depend on a favorable exercise of the court's discretion.

[11] For the first time at oral argument, Oceanwide argued that Article 27 could require Webcor to arbitrate claims against Oceanwide because the AAA Rules, which Article 27 incorporated, allowed for the joinder of parties to an ongoing arbitration proceeding. Initially, we note that Oceanwide has forfeited this contention by failing to raise it in its briefs. (See *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9 (*Haight Ashbury*) ["We do not consider arguments that are raised for the first time at
(*Fn. is continued on the next page.*)

24

*supra*, 84 Cal.App.4th at 676; *Fuentes*, *supra*, 26 Cal.App.5th at 551-552.)

Oceanwide cites *Macaulay v. Norlander* (1992) 12 Cal.App.4th 1 for the proposition that a third-party beneficiary's inclusion in an arbitration provision may be inferred from the "nature of the agreement as a whole." We are unpersuaded. Initially, the amorphous concept of "the nature of the agreement" cannot override the clear language of the arbitration agreement. *Macaulay* itself stated that a court must "scrutinize the language [of the contract] to determine whether it selectively includes or excludes the [third party] from the arbitration provision." (*Id.* at 8.) There, the contract *expressly included* the relevant third party in the arbitration provision. (*Id.* at 7 [relying on agreement's statement that "'the terms and conditions hereof, including the arbitration provision . . ., shall be applicable to all matters between [the third party] and you'"].) Moreover, nothing in the nature of a construction subcontract requires that the owner/developer be included in an arbitration provision. (Cf. 9 Corbin on Contracts, *supra*, § 45.3 [addressing third-party status of owners in construction subcontracts, generally; "the case law generally supports the view espoused in this treatise that the owner is typically not an intended beneficiary of such contracts"].) In

oral argument"].) Moreover, AAA Rule R-7, the rule Oceanwide referenced, addresses the procedures governing the joinder of parties. It does not provide an independent basis to compel arbitration outside the scope of any arbitration agreement.

short, Oceanwide had no standing to compel arbitration under the subcontract as a third-party beneficiary.

Under Code of Civil Procedure section 1281.2, a trial court has discretion to refuse to compel arbitration if "[a] party to the arbitration agreement is also a party to a pending court action . . . with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact." (Section 1281.2(c); see also *Daniels v. Sunrise Senior Living, Inc.* (2013) 212 Cal.App.4th 674, 680 ["whether to stay or deny arbitration based on the possibility of conflicting rulings on common questions of law or fact is reviewed for an abuse of discretion"].) While the trial court employed a different analysis than we have, it ultimately declined to order arbitration based on the risk of conflicting rulings in separate proceedings.[12] Appellants do not

---

[12] It is not the case that parties to arbitration agreements may avoid enforcement whenever they include nonsignatories in the litigation. The trial court has discretion to compel arbitration, even under the circumstances outlined in Section 1281.2(c). Moreover, under the equitable estoppel doctrine, nonsignatories may be able to compel a signatory to arbitrate when, inter alia, the signatory "has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are '"based on the same facts and are inherently inseparable"' from arbitrable claims against signatory defendants." (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1713.) Oceanwide did not invoke this doctrine below and does not argue it on appeal.

26

challenge the court's authority to do so if Oceanwide could not compel Webcor to arbitrate its claims against Oceanwide.[13]  Accordingly, we find no reversible error in the court's orders.

---

[13]    For the first time at oral argument, appellants raised three contentions concerning the court's authority under Section 1281.2(c) to refuse to compel arbitration if Oceanwide could not enforce Article 27 in court:  (1) Lendlease suggested there could be no risk of conflicting rulings because the arbitrator could join Oceanwide as a party to arbitration between Webcor and Lendlease under the AAA Rules; (2) Oceanwide contended there could be no risk of conflicting rulings even if only Webcor and Lendlease alone proceed to arbitration because other than the quantum meruit claim, Webcor's claims against Oceanwide depend on Webcor's contractual claim against Lendlease, and Webcor could not proceed to final adjudication on its quantum meruit claim without first abandoning its contractual claim; and (3) Oceanwide argued Section 1281.2(c) is preempted by the FAA. Appellants have forfeited these claims by failing to raise them in their briefs.  (See *Haight Ashbury*, *supra*, 184 Cal.App.4th at 1554, fn. 9.)  Additionally, as to Lendlease's reference to the AAA Rules regarding joinder, we again note that those rules provide no independent basis for arbitration between parties who did not agree to arbitrate.  And as to Oceanwide's preemption argument, we observe that California courts have held that the FAA does not preempt Section 1281.2(c) unless the arbitration agreement expressly adopts the FAA's procedural rules.  (See *Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 840-841 [no preemption of Section 1281.2(c) unless FAA's procedural rules apply, and those rules do not apply in state court, absent express provision in arbitration agreement]; *Los Angeles Unified School Dist. v. Safety National Casualty Corp.* (2017) 13 Cal.App.5th 471, 479-482 [same].)  Oceanwide has not contended that Article 27 expressly adopted the FAA's procedural

*(Fn. is continued on the next page.)*

## DISPOSITION

The trial court's orders denying appellants' motions to compel arbitration are affirmed. Webcor is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.

---

rules, whether directly or by reference to the Contract Documents.